At Now, Mary Davis, Marilyn Barton, 23, 375. Good afternoon, your honors, and may it please the court. We allege in this case that the defendants have not made out their burden to establish summary judgment on any of the claims that were brought by Ms. Phillips. The record is very clear that prior to my client making complaints in March of 2018, she was essentially promised, and this is in the light most favorable to her, she was promised an upgrade, promotion with a raise. She then makes a complaint in March of 2018 directly to her supervisor, Defendant Davis, who promised her that upgrade. And instead of Defendant Davis doing what she was required to do by FIT's own rules, she did not bring that claim to the Affirmative Action Office, which is where this was supposed to be presented. Instead, she told my client that she had to bring it if she wanted to, but that she didn't believe her, that she instead believed Defendant Barton as well as the other two individuals who were complained about by my client. My client went forward and made the complaint to FIT's Affirmative Action Office, where it was investigated initially, and the defendants in this case knew that they were named in that complaint. Both Defendant Barton and Defendant Davis were told that there was a complaint made against them, and they were given an opportunity to give a statement, which they both did, in response to that. The investigation at that point stopped. At least there's no record that anything else happened. And so from essentially July of 2018 until May of 2019, a period of about a year and a half, my client was retaliated against, and she was threatened with her life. How was she retaliated against in that time? What happened in that time that was a retaliation? Well, during that time, my client was denied the upgrade that she was promised. And so we would argue, Your Honor, in the light most favorable to us, that in 2017, when our client had gone to the HR division, and she spoke with Natasha Unelas, and as directed by Defendant Davis, because Defendant Davis had directed her to try and establish a new title, given the new responsibilities that she had in her job. She spoke to her at the end of 2017, and that upgrade should have happened, certainly during that period of time. Did she claim that the failure or refusal or declination, however you want to, whatever word you want to use to upgrade, was in retaliation? Yes, absolutely, because she was told that she was going to get that upgrade. And she went forward in 2017, at the end of 2017, and you can see that at the record. I think it's A120 in the record, that she went to HR, as she was directed, and spoke to them about the new title. And it was, at that point, incumbent upon Defendant Davis and FIT to take the remaining steps to promote her. Now, your claim of adverse action is not what happened afterwards, the scene, the fact that she was moved to another place. Your claim of adverse action in retaliation goes to the upgrade, and you're saying that she did everything that she needed to do there, because the claim is made that afterwards, she didn't do what she needed to do to get the upgrade. Right, the defendants are arguing that she abandoned the upgrade. What we're saying is that she had already completed the steps that were necessary to get the upgrade. And the next step had to do with Defendant FIT and Defendant Davis doing what they were required to do in order to make that upgrade effective. As our client said in her affidavit, that it was incumbent upon Defendant Davis to make this happen. And she did not, at no time after our client did what she was supposed to do. And that any attempt by her at that point would have been futile. And the fact that Defendant Davis sided with Defendant Barton did not report the complaint. And this is sufficiently linked to the complaint of EEOC so that we have no problem with that? Yes, Your Honor. In the EEOC complaint, you'll see at the record, it's A41. One of the things that our client checked in the box was retaliation. So she asserted to the EEOC that she was being retaliated against. And we believe that the facts of the record facts- Sorry. Go ahead. So she has this discussion with Davis. And then she, according to you, takes some steps towards this upgrade. According to them, she doesn't really take all the steps that she needs to get this upgrade. And then she files a complaint. Correct. Correct? Correct, yes. Yes, Your Honor. So you're saying that the failure to upgrade her was as a result of the complaint? Was caused by the complaint? Absolutely. We believe that it was retaliatory. That had she not made this complaint- The timing is the reverse. So she would have eventually gotten the upgrade had she not filed the complaint. Yes, Your Honor. When you say that the timing is reversed, I'm- Why I say that, Your Honor. If you look at the record and it's A120, you'll see that at the end of 2017, my client had already been promised the upgrade. And that she had to go to HR and get a new title for what was going on. And you'll see- But she, when you say she'd been promised the upgrade, she says, I thought, she actually acknowledges that she stopped pursuing the upgrade after a while. So she wasn't promised the upgrade. She actually acknowledges that there was something more to be done in order to get the upgrade. No, Your Honor, if you look at the record-  Yeah, if you look at A120, my client was very clear that she had engaged with HR as she was required to do in order to get the upgrade. What she believed was futile was going back to Defendant Davis and asking her to take her part in what was necessary for the upgrade. But she had already been promised by 2017 that she was going to get the upgrade. She had gone to HR as she was instructed to do. And then after she made the complaint, which was March of 2018, that upgrade never came. And so that's the retaliation. And that is what we say is clear retaliation. Defendant Davis knew that she had been complained about in March of 2018 and took no further steps towards trying to get that upgrade approved. Are you saying that if there had not been this, she would have taken any steps that she needed to take to go further? Is that your argument? Yes, Your Honor. So the point is that she was instructed to go to HR to work out a title. She had done that. She testified that she spoke to Natasha Younelis in the HR department. There were e-mails that were back and forth between them about this topic. And then when the complaint was made about Dean Davis, Defendant Davis, that Defendant Davis took no further steps. Now, had they come back to my client and said, okay, you need to fill out this form and you had to do anything else, she would have done it, of course. I'm confused. I'm looking at 120 and 121 of her deposition. She says that she asked me, Dean Davis had asked me to look into a job title that would reflect his new job. And so in that discussion with Dean Davis, we had decided that I was going to go to Human Resources because, you know, they could help me with that. And I would decide what was the best job title for this position that we were discussing. Okay, were you required to submit any paperwork to Human Resources in connection with this process? And she says, no. You just said you were going to go to Human Resources because they can help you with I went to Human Resources. Where was the – you say that she was promised a job. Your Honor, I said in the light most favorable to my client. And if you read the section, so did you meet with Natasha Younelis to discuss a job title change or salary change? And this is at page A120, and it's page 120 of the deposition transcript. Could you – and what she says is, so did you meet – the question was, so did you meet with Natasha Younelis to discuss a job title change or salary change? The answer was yes. And what did you discuss with her? And I told her that Mary Davis and I had a conversation about an upgrade and a new job title. She had more responsibility. She was going to give me more responsibility. We had discussed what would be involved in this new position. And she asked me, Dean Davis had asked me to look into a job title that would reflect this new job. So if you look at that in the light most favorable and compare it also with the affidavit that my client submitted, it's very clear that they were having this conversation in 2017 about an upgrade. And then in March of 2018, when this complaint was made, there was no further conversation about an upgrade. So that's the position that we're arguing. Thank you very much. You deserve some time for rebuttal. Thank you. And we'll hear from the Fashion Institute of Technology first, I believe. May it please the Court, my name is Tara Daub. I represent Fashion Institute of Technology, commonly referred to as FIT. FIT respectfully requests that the Court affirm the decision of Judge Daniels below, dismissing the claims of Marjorie Phillips based on race discrimination, race-based harassment, and retaliation under Title VII and Section 1981 that she has asserted against FIT. Boiled down to their essence, her claims relate to three events which chronologically occurred in the following order. In July of 2017, she had a conversation with Dean Davis, in which Dean Davis spoke about the potential of offering her some duties in the future that could potentially lead to an upgrade to her job title. Dean Davis asked her to go to Human Resources and to obtain some position descriptions. It was unclear what position might be applicable. There is no dispute that plaintiff never came back to Dean Davis after she went to HR in 2017 and that she never raised this issue with anyone at FIT until her lawsuit was filed. There was already a promise for an upgrade. We should view this record in a way that suggests a promise from FIT and from Dean Davis. Your Honor, there is nothing in the record to suggest a promise. It is clearly a conditional discussion about the potential for the assignment of future job duties. And we can't read that as not necessarily a promise that you will get the job, but a promise that I will tell you that you must do anything else, which wasn't done. You're saying that wasn't there either. That's correct, Your Honor. Clearly, the ball was in plaintiff's court to come back to Dean Davis to continue the conversation. Plaintiff never did. Second Circuit law is very clear, as Judge Daniels recognized, that in order for there to be a failure to promote claim, there must be a position that is vacant and available, and there must be a process where the person applies and is denied the position. I thought that their argument, though he hasn't made it today, was that the scene that took place later, in which Martin was violent and vulgar with her, and that the move to a different thing were themselves sufficiently, or at least that we could look into, get more facts as to where they were sufficiently adverse, and that these were due to the complaint that was filed earlier. And for that, she cited some language by Martin of saying that she got mad because of the earlier complaint. I thought that was the argument. Now, is that not a valid argument? Even though he hasn't made it today, it's in the brief. Two points. The events at issue, the alleged discussion in July 2017 with Dean Davis about the potential for the assignment of duties that could lead to a position upgrade under the collective bargaining procedure, because the collective bargaining agreement procedure is the only way to obtain a position upgrade, other than directly applying for a vacant position. That happens in July of 2017. The plaintiff's efforts to move the ball forward on that in terms of discussions with HR end in about September. There is no protected activity until at least March of 2018. That's nine months later, that pass that spanned this period where plaintiff is doing nothing. So the argument that there's some sort of futility. And I will also mention that plaintiff does not actually allege that Dean Davis engaged in any discriminatory behavior. What she alleges is that there was co-worker behavior that she was concerned about. One of the references included someone referring to the term bastard, which she later said, I understand that's not discriminatory. I just found it insensitive. That is what caused her to go to human resources in March of 2018. Dean Davis didn't know about the complaint until several weeks after that during the investigation. And the event that the plaintiff also focuses on in her case in May of 2019 is the argument that she has with her co-worker, Barton, where she is criticizing Barton for helping a student who had forgotten to order graduation regalia. The plaintiff was. I'm sorry to interrupt, but I thought that the argument also not made today, but in the briefs. But in the briefs was that the later outburst where she threatens Ms. Phillips would not have been able to occur had FIT more expeditiously dealt with the initial affirmative action complaint. She does. Yes. Plaintiff does make that argument. Yes. She tries to make a negligence argument that FIT immediately commenced an investigation in whether the complaint was completely filed in March or April 2018. The record is it's all in there. But basically, as soon as the complaint is officially filed, I think it's actually in April of 2018. From that point, the affirmative action office jumps in, starts an investigation. The record is very full with respect to how many witnesses were interviewed. There is a very thorough investigation done over the weeks that follow. By July of 2018, it's pretty much complete. What plaintiff is alleging is that there was negligence on the part of the investigator for FIT because that investigator did not complete the report and sit down and have a conversation with her to let her know that there was a finding that there was no basis of discrimination found with respect to her allegations. That is the argument. What was the delay caused by? The delay was that the investigator had a lot of other assignments that she was dealing with. It did take longer than she would normally. So isn't there a valid theory pursuant to which, and one of my colleagues here has written very eloquently about delays in investigating these types of internal complaints. Isn't there some validity to a theory pursuant to which a significant delay by the employer in investigating a complaint of discrimination may be the basis for a negligence determination? No, Your Honor. There is no basis under Title VII or Section 1981 for a cause of action based on a negligent handling of an investigation. But couldn't this be delayed because the claim is delayed because of retaliation? The claim can also be that the delay was there because she had brought the complaint and they didn't want to do anything about it because they didn't like the fact that she was complaining. So at this stage, couldn't that be claimed beyond negligence that this was a retaliation? There is no allegation or argument in this case that Delaware Kakana, who was the African-American woman who was the investigator who was assigned with investigating this matter. I mean, you can see in the record she very diligently conducted the investigation. There is no argument that Ms. Kakana was either intentionally retaliating against the plaintiff or discriminating against her based on her race by not simply issuing the final investigation report. The plaintiff admits it was a negligence. Davis didn't push her to do the thing more quickly because of retaliation. The claim isn't against the investigator. The claim is against Davis. Dean Davis did not have any authority over anyone in the Affirmative Action Office. Delaware Kakana, the investigator, was the person who had full authority to conduct this investigation. And it was, understand, it was an efficient and prompt and effective investigation because the conduct never reoccurred. I mean, FIT dealt with it, you're saying. As soon as the complaint was made, the second complaint was made about this outburst, FIT suspended Ms. Davis. Is that right? So the series of events is that the alleged conduct against Barton, the only… I'm sorry, against Ms. Barton as well. The only allegation that actually has anything to do with race involving Ms. Barton relates to a conversation that the plaintiff overheard Ms. Barton having with the student aid the day after the November 26th presidential election, in which Ms. Barton was explaining to the student aid the electoral process and the three-fifths compromise, the historic inequities of the three-fifths compromise. And that was the basis. As I understand it, just to speed it up a little bit. Yes. So as I understand it, FIT started its investigation of that Affirmative Action complaint within weeks. Is that correct? Yes. So that comes to FIT in March of 2018. The complaint is submitted finally. There was a process for submitting the complaint, but by April of 2018, the plaintiff's complaint about the November 16 incident where she overheard this comment, that is investigated promptly. Nothing has happened since November of 2016 involving Ms. Barton that is alleged to be discriminatory. Nothing happens after that. Fast forward over a year and a half later to the conversation in May of 2019 that is alleged to be retaliatory. That conversation, the facts and circumstances relating to that conversation, as Judge Daniels made very clear, there's no indication either by the words that Ms. Barton used nor any of the facts and circumstances that that incident had anything to do with either Ms. Phillips' race or retaliation. Completely unrelated. All right. So we've got your argument well in hand, and we'll hear from Mr. Weissman on behalf of Mary Davis. Good afternoon, Your Honors. May it please the Court, Robert Weissman from Suresky-Casadrano for Appley Mary Davis. Your Honors, the bottom line with regard to my client is that the plaintiff simply dropped the ball regarding the upgrade. There was no promise, and her testimony and her deposition is quite clear about that. She admits in response to paragraph 48 of the Rule 56.1 statement that she failed to follow up after meeting with HR. There's all this discussion about her meeting with HR, and that's all well and good. That's not disputed. But it's also not disputed that she never came back to Davis after that and followed up and said, I've got this information. Let's continue the discussion. In fact, she admits at page 31 of her reply that even after filing the affirmative action complaint, she did nothing to spur any kind of new activity on this. So all we have is a continuation of the status quo, that there is no activity that could be considered retaliatory after the affirmative action complaint is filed. The simple cessation of progress on the update occurred in September of 2017 when the plaintiff abandoned it, and there was nothing that could be considered retaliatory after that. The only thing that we have here is Plaintiff's feigned issue of fact, her repeated references to her affidavit, where she suddenly changes from her deposition testimony where she says, I was going to go to HR. We decided I was going to go to HR. I would decide what was the best title. Page 8139, we stopped the process because we couldn't come up with a title. And now all of a sudden in her affidavit in opposition to summary judgment, she says, the burden was on Mary Davis to move this forward. Was your client responsible for the move that she does say in her brief was to a section which was less desirable? No, Your Honor. That's not an issue. Well, first, that's not an issue that's raised with regard to Ms. Davis in the brief. The only issue with regard to Ms. Davis raised on appeal is the question of whether the failure to pursue an upgrade was retaliatory. Go through the issues in the appellant's brief. That's the only one pertaining to Ms. Davis. Let me say this. Yes. So as to the feigned issue, she says, all of a sudden in opposition to summary judgment, I never told Mary Davis, or Mary Davis never told me to get back with her, back to her on this and to take the lead. She could have followed up on it if she had wanted to. That's the direct contradiction to what she testified to at her deposition, and it fails to raise an issue of fact. Thank you very much. Thank you. We'll hear from Mr. Minkin on behalf of Marilyn Barton. Good afternoon, Your Honors. May it please the Court. My name is Bruce Minkin. I represent Defendant Marilyn Barton. It appears that to some extent maybe a plaintiff is waiving its retaliation claim against Ms. Barton. In response to Judge Calabresi's question, he spoke about the upgrade. Regardless, I will talk about the retaliation because I think that that's what's pressing here. Surely. First, let's understand that Marilyn Barton and Appellant Marjorie Phillips were co-workers. They're employees. They're both still employed by FIT. Second, as the Court knows, Barton had no authority to discipline. She didn't supervise. She had nothing to do with the work. Okay. Precisely. So, therefore, the only retaliation- I do. The only retaliation to the extent that the appellant has claimed here is of what took place on May 16, 2019. And the May 16, 2019 incident was not a material adverse action. The case, the law is clear. The facts are clear. Appellant cites to the record- So, in the context of retaliation, as you know, Mr. Minkin, the standard is relatively low, which is would it be likely to deter an employee from filing a complaint, for example, for engaging in protected activity. And I think that the theory or the argument on the other side, if Mr. Sellers can correct me if I'm wrong about this, is that when a co-worker yells- is alleged to have yelled at another co-worker and said, I'm going to effing kill you, and according to at least one side does that and physically also threatens her, that that might be something that would deter a reasonable employee from engaging or complaining about that co-worker. That's the argument. As District Judge Daniels found in his opinion, the plaintiff, the appellant here, was able to make her complaints and in fact made a number of complaints. So she was not dissuaded in any way to make a complaint. Well, but that is always what people say. Because you make another complaint, that means this isn't chilling. But the question of whether it's chilling isn't whether it chilled this person, but whether a reasonable person would be chilled. And the argument is made that if, because I made a complaint against you, you said with some nasty language that I will kill you, that that might chill a reasonable person from making a complaint. And the fact that this person made it doesn't change that. Well, Judge Daniels also talked about how the retaliation claim fails, because under the hostile work environment standard, it failed as well because it was not deemed severe. It may not be sufficiently severe to be a hostile work environment, but it may be sufficiently severe to chill a person from making a complaint. That's the argument, so that's what we want you to mean. And if you take into context, Judge Calabresi, the circumstances here, and context surely is important. We're talking about two folks who've shared and worked in an office together for eight years. They've never had a problem like that before. Ms. Barton had never, ever threatened Ms. Phillips at all. There was never, ever a reference- So when you say it's not severe, you know, and I don't mean to trivialize this, but if one of my colleagues said, I'm going to effing kill you because I've dissented, I would think twice about dissenting. So I think that's a- I'm finding it a little difficult within the context of a workplace where someone uses that phrase against another co-worker to say that that's not severe, sufficiently severe at least for a jury to make that determination. Well, the case law talks about the need for it to be extremely severe, and that was decided by this court on appeal in De La Pena versus Metro Life. What more severe words can someone use other than I'm going to kill you? Well, I also want to address, your honors, that two hours or so, or an hour after the incident, when we're talking about the ability, the being dissuaded of making a complaint, in appendix 62 in the record, Marjorie Phillips sends an email, okay, to the affirmative action folks at FIT, and she writes, I quote, today Marilyn Barton exploded and threatened to kill me in the office. Apparently she didn't like a professional opinion I expressed in difference of opinion about an office matter and completely lost it. I'm too upset to come over now, but will follow up with you later to find out your availability. So how severe was it? There was testimony that she continued to live her life as she did immediately after. So what does an opinion from the Second Circuit look like when we say, if a co-worker tells another co-worker, I'm going to kill you, that is not severe enough. So with respect to our own workplace conduct rules, what does that look like? Tell me, chart a path for me to be able to say that. I think because Ms. Phillips and Ms. Barton have had a history of working together for years. Because they are equal levels, I think that type of threat is of no moment at this point. But there was a comment that she made the threat because of the previous affirmative action claim, wasn't there? Isn't that in the record? Yes, it is in the record. And respectfully- So what we have is both a question of whether this is severe enough and some evidence as to causation. Why isn't that enough? I'm glad you asked that question, Judge Calabresi. If you inspect the record A63 to A65, you'll read my client's, Defendant Barton's notes or comments that she made during the course of the FIT investigation. And the FIT HR folks took these notes down. And five, six times she talks about being bullied, constantly belittled, constant comments. I'm sorry it was the last straw, okay? Mr. Sells' comment, Appellant's point is that she did say she accused me of, there was a situation where she accused me of racism. That's one sentence, that's one comment. If you look at this document in its entirety, in its entirety, it's quite clear that what motivated my client on May 16, 2019 was because she was being bullied for years. Thank you very much. Thank you. Mr. Sells, you've got two minutes for rebuttal. Thank you, Your Honor. My first point is I have not abandoned any of my arguments. Okay. Second, in terms of the nature of the threat, in the Cater case in which Judge Cabrera sat, and the Castagna case in which Your Honor, Judge Lawyer sat, both indicated that threats of violence, threats to kill, combined with Judge Calabrese's decision in the Torres case, which said that in this circuit, one incident is enough to establish a hostile work environment. Can be enough, not enough. Can be enough, but if you read it in conjunction with the Cater and the Castagna cases, where you have threats of violence as being the most extreme, you don't get any worse than this. The only thing worse than this is if she was killed because she was threatened to be killed multiple, multiple times. Now, that, we allege, is both retaliatory and it is discriminatory because, as my client testified, she never saw Defendant Barton acting this way against any white person. All right? And we believe that that is sufficient to establish at least a question of fact. In terms of the statement that Ms. Barton made about feeling bullied and all of this going on, definitively shows that this was a cauldron, that it was about to explode, and the failure of FIT to take a prompt and remedial response is what led to this. We're not saying that there lacked- Go ahead. Two quick things. Sure. So first, they immediately responded to the first complaint. They then immediately responded to the second complaint when they suspended Ms. Barton. Second thing is that, as I think Counselor for FIT mentioned, these are categorically two different types of complaints. One is about race. The other is about retaliation a year later that seems to be unrelated in a lot of ways to the original complaint except for this little bit. All right. Can I address that, Your Honor? Because, number one, we're saying it has to be effectively remedial. Just going out and doing an interview, that might be prompt, but it's not effectively remedial because the issue had not been resolved for a year and a half, and you had this explosive situation that was building up to the point where it occurred. So it may have been prompt, but it was not effectively remedial. Now, the second point, which Your Honor brings up, what we have is a situation where Marilyn Barton herself admits that why she exploded was because of the EEO complaint. We have Delaware Kakana, the investigator, who says, whoa, I never knew that Marilyn Barton had admitted that her conduct was about the complaint because she didn't investigate that. We got your argument well in the end. Okay. Thank you very much. That concludes our decision. All right.